IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:11CR321-1 |
| | ) | |
| | ) | |
| MONTE EMMANUEL STRAITE | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Monte Emmanuel Straite's

second pro se motion for compassionate release [Doc. #121]. Straite first moved

for compassionate release based on COVID-19-related concerns. That motion was

denied because, even assuming Straite exhausted his administrative remedies, he

did not show extraordinary and compelling reasons warranted relief. He now

moves for compassionate release in light of United States v. McCoy, 981 F.3d 271

(4th Cir. 2020), and the stacking of his two § 924(c) convictions when he was

sentenced, as well as continuing COVID-19 concerns. For the reasons explained

below, his motion is denied.

On October 25, 2012, Straite was sentenced to 519 months' imprisonment

for armed bank robbery, attempted armed bank robbery, and brandishing a firearm

on each occasion. "The court may not modify a term of imprisonment once it has

been imposed except", as is relevant here, "upon motion of the defendant after the

defendant has fully exhausted all administrative rights to appeal a failure of the

Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30

days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier". 18 U.S.C. § 3582(c)(1)(A).  As explained in the Court's Memorandum Order denying Straite's first motion for compassionate release,

> Straite claims that thirty days have lapsed since he submitted a compassionate release request to the warden.  He does not provide the date he submitted the request or a copy of the request, but he does describe the bases upon which he asked the warden for compassionate release – his ongoing chest pain due to heart murmurs which causes shortness of breath, anxiety, overexertion, and irregular heartbeats.

(Mem. Order at 2 [Doc. #118].)  Ultimately, it mattered not whether Straite had exhausted his remedies because he had not shown extraordinary and compelling reasons for relief. (Id.)  In support of the instant motion, Straite makes no mention of having submitted another request to the warden based on McCoy.  Instead, he seeks a waiver of the exhaustion requirement because of COVID-19.  Although COVID-19 could necessitate timely action, the circumstances here do not support such a conclusion, and the Court declines to waive the exhaustion requirement even if it had the authority to do so.  Nevertheless, as before, even if Straite has exhausted his administrative remedies, he has not shown extraordinary and compelling reasons in support of his motion.

Straite first argues that § 403 of the First Step Act "would have benefitted [him] if it had been in effect at the time of his prosecution and sentencing." Because it was not, "he is serving an effective life term without any possibility for parole, for crimes that did not involve loss of life or serious bodily injury."  He cites to McCoy and "other district courts across the country" that have granted relief.

2

On September 27, 2011, a grand jury charged Straite with three counts associated with the April 23, 2009 robbery of a Bank of America in Advance, North Carolina: bank robbery, armed bank robbery, and brandishing a firearm during a crime of violence. (Indictment, Counts 1-3 [Doc. #1].) In the same indictment, he was charged with three counts associated with the July 6, 2009 attempted robbery of the same Bank of America in Advance, North Carolina: attempted bank robbery, attempted armed bank robbery, and brandishing a firearm during a crime of violence. (Id., Counts 4-6.) A jury convicted Straite of all six counts. At sentencing, his guideline range for Counts 2 and 5[1] was 135 to 168 months for which he received 135 months, followed by a consecutive eighty-four months for Count 3 and 300 months for Count 6 for a total of 519 months' imprisonment.

At the time of Straite's conviction and sentencing, "a second or subsequent conviction under [§ 924(c)]" required the defendant to "be sentenced to a term of imprisonment of not less than 25 years". 18 U.S.C. § 924(c)(1)(C)(i). Straite's only § 924(c) convictions are those arising from the underlying indictment. But, because Straite was convicted in Count 3 of violating § 924(c), the statute required that a 300-month consecutive term of imprisonment be imposed for his conviction in Count 6 of violating § 924(c) because it was considered his "second or subsequent conviction under [that] subsection".

---

[1] Bank robbery is a lesser included offense of armed bank robbery, so Counts 1 and 2 merged. The same is true for Counts 4 and 5.

Case 1:11-cr-00321-NCT   Document 122   Filed 03/08/21   Page 3 of 10

As the <u>McCoy</u> court explained, § 924(c)

> imposes mandatory minimum sentences for using or carrying a firearm
> in connection with a crime of violence:  for a first offense, a five- to
> ten-year mandatory minimum, depending on the circumstances, and
> for a subsequent conviction, a consecutive 25-year mandatory
> minimum.  Prior to the First Step Act, a conviction was treated as
> "second or subsequent," triggering the 25-year minimum sentence,
> even if the first § 924(c) conviction was obtained in the same case.
> The First Step Act ended this practice, known as sentence "stacking,"
> by clarifying that the 25-year mandatory minimum applies only where
> a prior § 924(c) conviction arises from a separate case and already
> "has become final."  Under § 403 of the First Step Act, that is, the
> 25-year mandatory minimum is reserved for recidivist offenders, and
> no longer applies to multiple § 924(c) convictions obtained in a single
> prosecution.

981 F.3d at 275 (internal quotations and citations omitted).  "But that change

does not apply retroactively to sentences . . . imposed before December 21, 2018,

when the First Step Act became law." <u>Id.</u>

Nevertheless, the <u>McCoy</u> court held that a district court could consider

whether this "exceptionally dramatic" "sentencing change", among other factors

and as applied on an individualized basis, is extraordinary and compelling for

purposes of a defendant's motion filed pursuant to 18 U.S.C. § 3582(c)(1)(A). <u>Id.</u>

at 285, 286; <u>see also</u> <u>id.</u> at 284 (explaining that "as of now" there is no

"'applicable' policy statement governing compassionate release motions filed by

defendants . . . , and as a result, district courts are empowered . . . to consider

<u>any</u> extraordinary and compelling reason for release that a defendant might raise")

(citation omitted).

4

For Straite, his conviction in Count 6 of the indictment would now necessitate a consecutive seven-year sentence, rather than a consecutive twenty-five year sentence. There is no dispute that is a significant difference; however, it is only part of the story. An individualized assessment reveals a very different narrative than that of the defendants in McCoy.

At the age of eighteen, Straite stole $14,721 from a Food Lion in Charlotte, North Carolina when he committed robbery by means of an assault consisting of possessing a handgun and threatening and endangering the life of a victim. (Presentence Report ¶ 45 [Doc. #99].) Less than two weeks later, he again robbed a Food Lion by the same means. (Id.) He was convicted of two counts of felony robbery with a dangerous weapon and sentenced to thirty-eight to fifty-five months' imprisonment in August 2006. (Id.) He was released to post-release supervision in March 2009, (id.), and less than two months later, he was involved in the instant offense conduct.

On April 23, 2009, Straite and two others entered the Bank of America in Advance, North Carolina, each armed with guns. (Id. ¶ 5.) As explained in the Presentence Report,

> the female jumped over the counter and commanded two employees to get down. [She] asked the tellers where the money was located and one of the employees opened his teller drawer and pointed towards the other teller drawer. After retrieving the money . . . , the woman walked to the entrance of the vault and was allowed access . . . by one of the other males.
>
> During the robbery, one of the males went into the office of the bank manager, who was sitting in a chair. The male grabbed the bank

5

manager, hit him with the gun, and pushed him out of the office.  [He] hit the manager with the gun again and made him and the assistant bank manager lay on the floor in the lobby.  While on the floor, the bank manager was hit repeatedly with the gun and began to bleed.  After a while, the male who was holding the manager and assistant manager at gunpoint[] instructed the two employees to open the vault.  One of the males with a gun continued to hit the bank manager.

In the vault, the robbers continued to look for more money.  [They] continued to assault the bank manager and called the assistant bank manager a "bitch" when they found that there was significantly less cash in the vault than they anticipated.

(Id. ¶¶ 5-7.)  After retrieving $51,091, the robbers left the bank. (Id. ¶ 8.)  The bank manager sustained injuries requiring medical attention. (Id.)  Law enforcement efforts to find the robbers were unsuccessful. (Id.)

On July 6, 2009, the robbers returned to the same bank, but their arrival in the parking lot caught the bank manager's attention who noticed that at least two of them were carrying guns. (Id. ¶ 9.)  The manager locked the front door and advised all customers and employees to move away from the door. (Id.)  The robbers left when they realized the front door was locked. (Id.)  Law enforcement soon located the female robber who identified herself and others, including Straite. (Id. ¶ 12.)

In sum, less than two months after being released to supervision after serving a term of imprisonment for two counts of felony robbery with a dangerous weapon, Straite committed armed bank robbery then returned several months later to do the same, thwarted only by the bank manager's swift action.  This conduct reveals someone undeterred from committing violent crimes.

6

Straite has served approximately ten years in custody for these offenses but what he has done with his time is unknown. While he claims that his requests for education and disciplinary records have gone unanswered, he makes no attempt to tell the Court what those records would evidence. For example, he has not described his disciplinary record, participation in educational or vocational courses or programs, employment in the Bureau of Prisons, efforts towards restitution[2], or any other information that would reflect on his time in custody. He claims to have a "comprehensive release plan" that he can submit, but he did not submit it or describe its contents in detail.

Straite's circumstances are far different than those of the defendants in McCoy. For example, McCoy himself was a teenager at the time of his robberies with one prior conviction for reckless driving and at the time of his compassionate release motion had served over seventeen years of his sentence, had "many educational and vocational achievements", and had paid nearly $10,000 towards a "restitution order shared among seven co-defendants." McCoy, 981 F.3d at 278.

In addition to the stacking of his § 924(c) convictions, Straite relies on COVID-19-related concerns. He describes his history of seizures and muscle spasms; claims to be on chronic care, to have been issued a bottom bunk pass after suffering a nighttime seizure, and to have been prescribed medication; and

---

[2] In October 2020, Straite opposed the Government's motion to authorize payment toward his special assessment and restitution from his inmate trust account (Resp. [Doc. #111]), but the Court granted the motion, (Order [Doc. #113]).

describes having suffered "residual sharp chest pain and severe headaches".  As the Court previously explained,

> Straite has provided no medical records[3] or other evidence reflecting his health, but his 2012 Presentence Report notes that he reported a "history of seizures and muscle spasms that begin in 2005" and "[r]ecords from the Forsyth County Detention Center reflect [that he was] taking [a medication] to control the seizures." (Presentence Report ¶ 58.)  The Centers for Disease Control and Prevention ("CDC") recognizes that neurologic conditions might increase the risk "for severe illness from the virus that causes COVID-19". https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Dec. 1, 2020).  However, presently the CDC does not identify a seizure disorder as among the neurological conditions it references and instead specifies dementia. Id. ("Having neurologic conditions such as dementia might increase your risk of severe illness from COVID-19."). As for Straite's heart murmurs, irregular heartbeats, shortness of breath, and chest pains, the CDC includes heart failure, coronary artery disease, cardiomyopathies, and pulmonary hypertension as among the conditions that do place individuals at increased risk of severe illness from COVID-19. Id.  Yet, Straite does not claim to have any of those diagnoses.

(Mem. Order at 3-4.)  Nothing in the CDC's February 22, 2021 update appears to change these previous assessments. See https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.  Similar to his first motion for compassionate release in which he described being given a bottle of Ibuprofen after he complained of chest pains, Straite contends that the dispensing of medication for his chest pains and headaches has been inconsistent

---

[3] Straite claims that because of the Department of Justice's investigation into Coleman's handling of the pandemic and the nationwide lockdown of all federal prisons, "all inmate requests for medical records have been . . . ignored."  Even if medical records evidence the conditions upon which Straite relies, as is assumed here, he has not met his burden of showing extraordinary and compelling reasons.

8

during the pandemic.  This information, though, falls far short of describing extraordinary and compelling conditions.

Straite describes the "outbreak of COVID-19" at "the Coleman complex" as "so widespread . . . that the Department of Justice" is investigating the facility's failures.  He is concerned that "the Coleman complex" is "susceptible to further outbreak and spread" and more deaths due to the "more virulent 'next-generation' strain".  Straite is housed at U.S. Penitentiary Coleman II which has a significant history of reported COVID-19 cases, but, as of March 5, 2021, appears to be better able to control the spread of the virus than in the past. See Fed. Bureau of Prisons ("BOP"), COVID-19 Coronavirus, https://www.bop.gov/coronavirus/ (reporting one inmate and twenty-six staff members presently positive, one inmate who has died, and 209 inmates and twenty-four staff members who have recovered).

Moreover, the BOP has begun administering the COVID-19 vaccine to staff and inmates.  On January 4, 2021, it published its updated COVID-19 Vaccine Guidance recommending that vaccinations first be offered to correctional staff "to decrease the possible introduction of SARS-CoV-2 into institutions and thus protect inmates" then offered to inmates according to priority levels. Fed. BOP Clinical Guidance, COVID-19 Vaccine Guidance (Jan. 4, 2021 v.7.), available at https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  As of March 5, 2021, the BOP has administered over 71,000 doses of the vaccine among its facilities, including FCC Coleman where 352 staff members and 563 inmates have

been fully inoculated. https://www.bop.gov/coronavirus/. Straite's fear of

contracting COVID-19 is understandable, but it is insufficient even when combined

with the stacking of his § 924(c) convictions to show extraordinary and compelling

reasons that warrant a sentence reduction.

For the reasons explained above, IT IS HEREBY ORDERED that Defendant

Monte Emmanuel Straite's second pro se motion for compassionate release [Doc.

#121] is DENIED.

This the 8th day of March, 2021.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge